HUTCHISON v. THE ROCK HILL REAL ESTATE AND LOAN COMPANY.

1. CORPORATION—DIRECTORS—BOND—ASSETS.—Under the provisions of the charter of The Rock Hill Real Estate and Loan Co. and its by-laws, the board of directors had the power to execute a bond and secure same by assignment of its assets.

2. IBID.—IBID.—SECRETARY—TREASURER— FRAUD— ASSETS— ASSIGNEES. —Where a board of directors permit its secretary and treasurer to manage the business of the corporation, and he certifies that a resolution has been passed by the directors, this being one of his duties as secretary, authorizing the execution of a bond and assignment of assets to secure the same, the corporation is bound by the acts of such officer, whether such resolution was passed or not, and whether

the directors had notice of it or not; and in the absence of fraud on the part of, and of personal benefit to, the directors, the assignees are 'bona fide holders of such assets, there being good faith on their part in the transactions.

3. IBID.—IBID.—STOCKHOLDERS—FRAUD.—RATIFICATION by directors of the acts of their secretary and treasurer, and their refusaal to bring an action to set aside transfer of assets made by him, do not constitute fraud against the other stockholders, unless the directors had notice of such facts as might reasonably be expected to make such suit successful.

Before GARY, J., York, November, 1901.   Reversed.

Action by Jennie E. Hutchison and B. P. Reid against The Rock Hill Real Estate and Loan Co. Special referee, J. S. Brice, filed the following report:

"By order of Mr. Justice Klugh, dated October 30th, 1900, all of the issues of law and fact in the above entitled cause were referred to me to take testimony and report my conclusions thereon, with leave to report special matter. Agreeable to the provisions of the above order, I have held numerous references and taken a mass of oral and documentary testimony, which is herewith submitted.

"The plaintiff in her complaint after alleging that the defendant, The Rock Hill Real Estate and Loan Company, is a corporation duly organized under the laws of this State, with its office and principal place of business in the city of Rock Hill, and that the defendants, Frel Mobley, W. C. Hutchinson, D. Hutchinson and R. Lee Kerr, constitute the board of directors thereof, and that the defendants, the National Union Bank, is a banking institution organized under the laws of the United States, and that said bank does business in the said city of Rock Hill, and that the defendants, Haines & Bishop, are partners in business in the city of New York, under the firm name of Haines & Bishop, alleges that the defendants, the National Union Bank of Rock Hill, S. C., and Haines & Bishop, are in the possession of certain assets belonging to The Rock Hill Real Estate and Loan Company, for which an accounting is demanded in this

action. The plaintiff also alleges that she is a stockholder in the real estate and loan company, and that she brings this action in her own interest and also in behalf of all other stockholders of said Rock Hill Real Estate and Loan Company, who may become parties to the action and who may contribute to the expenses thereof. That prior to the 1st of November, 1899, the said Rock Hill Real Estate and Loan Company was a solvent corporation, and held bonds and notes well secured by mortgages on real estate of the value approximating $70,000, and that amount was sufficient to pay all indebtedness of said company, which was small, and to refund to the stockholders the amount paid in by them with a premium thereon. The plaintiff also says that between the 1st day of November, 1899, and the 31st day of December, 1899, that practically all of the assets of The Rock Hill Real Estate and Loan Company were illegally transferred and assigned to the deefndant, the National Union Bank of Rock Hill, S. C., by the defendant, R. Lee Kerr, the secretary and treasurer of the said The Rock Hill Real Estate and Loan Company, and a director and stockholder therein. In that connection the plaintiff charged that said assignment and transfer was made in exchange for certain demands held by the defendant bank against the Rock Hill Cotton Factory Company, which was then insolvent, and in the hands of R. Lee Kerr, its receiver; that of the said insolvent demands so taken in charge, there was one note payable by the said Cotton Factory Company to W. L. Roddey in the sum of $2,500, and held by the said bank and known by the said R. Lee Kerr to be worthless, and the payment of which he had been previously instructed by the Court to resist, and which note on said resistance had been disallowed as a claim against the Cotton Factory Company. That the other claims the said R. Lee Kerr received from said bank, in exchange for the solvent assets of the said Real Estate and Loan Company, were claims of such a character that it was well known that not more than twenty-five per cent. of their face value would ever be realized

thereon.   And plaintiff also submitted as exhibit 'A' to her complaint, a partial list of the assets and securities transferred by R. Lee Kerr to the National Union Bank, and alleged that he had transferred other securities, not included in said list, aggregating a further large amount, and that the said bank was collecting and using said securities as its own property, and the plaintiff asked that said bank be required to account fully for all the assets of the Real Estate and Loan Company so transferred and assigned.   And plaintiff still further alleged that one of the conditions or agreements of the transfer of said securities between R. Lee Kerr and the said bank, was that any surplus of these securities so transferred, after paying for the insolvent demands taken in exchange, should be held by said bank to indemnify it against loss in a suit which the said R. Lee Kerr, as receiver, had been instructed by the Court to bring against W. L. Roddey and the said bank for an amount involving about $3,000.   The plaintiff also states in her complaint that between the first day of February and the 31st day of March, 1900, the defendant firm of Haines & Bishop, being creditors of the Rock Hill Factory Company in the sum of $8,000, and who were prosecuting a proceeding in this Court against the said R. Lee Kerr for his removal as receiver of the said Rock Hill Cotton Factory Company, abandoned this proceeding for the removal of the said R. Lee Kerr, upon the said Kerr, as treasurer of the said Rock Hill Real Estate and Loan Company, transferring to said Haines & Bishop all the remaining equities in the assets of the said Real Estate and Loan Company held by the National Union Bank, and upon the said Kerr transferring, so plaintiff believed, sundry other assets and securities of the Real Estate and Loan Company and receiving in exchange therefor Haines & Bishop's claim against the Rock Hill Cotton Factory Company, worth not exceeding twenty-five per cent. of its face value, if of any value whatever; and that said assets and securities were held by the said bank and by W. B. Wilson, Esq., the joint attorney of said bank and of Haines &

Bishop.   And plaintiff avers and charges that these defendants and W. B. Wilson, their agent and attorney, well knew that said transfer was without authority and without value at the time it was made.   The plaintiff also alleges that by reason of this transfer and disposal of the assets of the Real Estate and Loan Company, its stockholders had been defrauded and the company rendered insolvent, and that no property could be found out of which to pay the taxes assessed against the said company for the year 1899.   The plaintiff also avers and charges that the board of directors of the loan company had no knowledge of said illegal transfer and did not authorize the same, and that while the plaintiff, through her agent and attorney, had made urgent and persistent efforts to have said directors institute some proceedings to recover these assets, still the said directors had refused and neglected to take any steps whatever looking to the recovery of said assets, and plaintiff charged that the assets of the company were being disposed of and wasted to advance some personal interest of one or more of the directors, and of those holding and controlling a majority of the shares of stock therein, and in fraud of the rights of the minority stockholders, and that she could obtain no relief through a meeting of the stockholders, as that meeting would be controlled by the board of directors, who held a majority of the stock.   Plaintiff then asks for the following relief: First: That the defendant, the National Union Bank of Rock Hill, S. C., be required to account for, pay over and deliver up all the bonds, notes and mortgages and all other securities transferred to it by R. Lee Kerr, and second: That the defendants, Haines & Bishop, be likewise required to account for, pay over and deliver up all securities and equities transferred to them by the said R. Lee Kerr, as secretary and treasurer of the said loan company.   Plaintiff also asked for the appointment of a receiver and for other relief, which does not affect the issues involved before me. The defendants, the National Union Bank of Rock Hill, S. C., Haines & Bishop, R. Lee Kerr, director and stockholder,

4—65

and W. B. Wilson, attorney and agent, answered jointly, specifically denying the various allegations of the complaint inconsistent with their answer. They admitted that the Rock Hill Cotton Factory Company was insolvent, and then set up a defense: That some time prior to the 5th day of December, 1899, The Rock Hill Real Estate and Loan Company applied to the National Union Bank through its president, W. J. Roddey, for a loan of about $20,000, and also proposed at the same time to purchase from the said bank: first, the judgment the said bank held against A. E. Hutchison and D. Hutchison, in the sum of $7,364.25, together with three notes on which said judgment was based, each of said notes being also against the said Rock Hill Cotton Factory Company; second, the judgment held by said bank against A. E. Hutchison and D. Hutchison in the sum of about $3,237.49; third, the promissory note made by the Rock Hill Cotton Factory Company to the National Union Bank in the sum of $2,500, dated October 1st, 1899, and that said note had been indorsed by W. L. Roddey, but he had been released from all liability thereon. These defendants alleged that the Real Estate and Loan Company offered and agreed to pay for the above mentioned securities the sum of $9,826.33, and that the National Union Bank agreed to sell said securities for said sum; and that on or about the 5th day of December, 1899, after being furnished with a certified copy of the resolution of the board of directors of The Rock Hill Real Estate and Loan Company, a copy of which resolution was attached to their answer as exhibit 'B,' the said National Union Bank agreed to loan the said Rock Hill Real Estate and Loan Company the sum of $19,826.33, and for which the said Rock Hill Real Estate and Loan Company executed its bond in the penal sum of $40,000, a copy of which bond was annexed to the answer as exhibit 'C.' And to better secure the payment of the said bond, The Rock Hill Real Estate and Loan Company at the same time executed and delivered to said bank the various notes, bonds and other securities mentioned in exhibit 'D' of

the answer.    And that out of the $19,826.33 so borrowed, the said Real Estate and Loan Company used $9,826.33 in the purchase of the two judgments and note hereinbefore mentioned, and that the remaining $10,000 was received from said bank in cash or its equivalent, and was used, as the defendants were informed and believed, in paying off certain indebtedness of the said Real Estate and Loan Company to the Atlantic National Bank of Wilmington, N. C., and its indebtedness to others, which said indebtedness was secured by some of the securities mentioned in exhibit 'D' of the answer; and that at the time of the transaction between the bank and the loan company it was impossible to ascertain the actual value of the two judgments and note above mentioned, for the reason that the Rock Hill Cotton Factory Company was in the hands of a receiver and the estate of A. E. Hutchison in bankruptcy, and both estates unsettled, and their value depended largely upon the result of pending ligitation which might cause the two said judgments and note to realize more or less than the price agreed upon.    The defendants further stated in their answer, that the $2,500 note from which W. L. Roddey had been released from liability, had not been disallowed by the Court, but that the same was before the Court on exceptions to referee's report, which report and exceptions were made subsequent to the sale of the note to the Real Estate and Loan Company, and the defendants were then, and still are, advised that said note is a valid claim.    The defendants also stated in their answer that on the same day of the transaction between the National Union Bank and the Real Estate and Loan Company, the Real Estate and Loan Company, through its secretary and treasurer, R. Lee Kerr, proposed to the defendant, W. B. Wilson, the attorney for the defendants, Haines & Bishop, to purchase their claim against A. E. Hutchison, D. Hutchison and the Rock Hill Cotton Factory Company, and the said Wilson agreed to accept the same percentage thereof as was paid to the National Union Bank, subject to the approval of Haines & Bishop, and a short time thereafter

it was agreed that said transfer would be made, but the transaction was not consummated until the 2d day of March, 1900, and after the adoption of the resolution of the board of directors of The Rock Hill Real Estate and Loan Company authorizing the same, and set out as exhibit 'E' of the answer. The defendants also claimed that one of the results of the transaction between the Real Estate and Loan Company and the National Union Bank and Haines & Bishop, was the termination of the expenses of litigation involving larger interests of the Real Estate and Loan Company, and was in other respects to the best interests of the said company. The defendants also denied that the Real Estate and Loan Company was insolvent, and asked that the complaint be dismissed with costs.

"The Rock Hill Real Estate and Loan Company was chartered by a special act of the legislature in December, 1888 (Statutes at Large, vol. 20, pages 248, 249 and 250), and under the act of incorporation the said company was authorized and empowered to loan and borrow money for the benefit of its members and stockholders, and to sell, convey, alien, or mortgage or otherwise dispose of its property as the corporation might deem expedient, and the said corporation was also vested with the powers, rights, privileges, subject to the restrictions and liabilities of the general incorporation act, approved December 23d, 1886, except in so far as that act was inconsistent with the provisions of the special act of incorporation. Under section 4 of the general incorporation act, it was the duty of the board of directors 'to manage the affairs and business of the company until their successors were elected.' And under the same act, the secretary was to serve for such time and under such conditions as the company may determine in their by-laws; and under sections 9 and 10 of the same act, the corporation was authorized to execute mortgages and deeds of trust by vote of a majority of the stock, at a meeting called for the purpose upon thirty days notice; and under the same act the treasurer was required to give bond in such sum and with such securi-

ties as shall be required by the by-laws for the faithful performance of his duty.   Under the by-laws of the Real Estate and Loan Company, on pages 4, 5 and 6 of the minute book, offered in evidence and marked exhibit 'C,' it is provided that 'the business of this corporation shall be under the care, management and control of a board of directors,' and no specific duties are prescribed for the various executive offices.   By an order made in this cause on the 11th day of September, 1900, by Judge Geo. W. Gage, Mr. W. J. Cherry was appointed receiver of The Rock Hill Real Estate and Loan Company, and while the plaintiff in her complaint claims that the company was insolvent and the defendants in their answer deny this, no such issue was raised in the arguments before me.   But perhaps it is proper for me to pass on this issue.

"D. Hutchison, the president of the company, testified that the company has no assets now at all.   W. J. Cherry, the receiver, testified that no assets were turned over to him; that he had demanded the assets of D. Hutchison and had received nothing, and he had made the same demand on R. Lee Kerr, who was in charge of the assets, and that R. Lee Kerr had informed him in substance that he had nothing to turn over to him.   It also appears from the testimony that the company did not succeed in raising the money to pay its taxes for the year 1899, until late in the spring of 1900. And then it appears from the testimony of P. B. Reid, a stockholder, that no dividend was paid to the stockholders in the year 1900.   And it also appears from the testimony of W. J. Roddey, a banker, that as a business man he would not now take the paper of the Real Estate and Loan Company for any amount as security.   In the financial statement of the condition of the company, made on the 28th day of May, 1900, by R. Lee Kerr, and sworn to, and evidently made to satisfy some stockholder who was pressing him (see exhibit 'AAA'), I find that it is claimed by Kerr that only $23,400 was due to stockholders; whereas, as a matter of fact, $46,300 in stock had already been presented to the

clerk of Court in this cause, with a probability of several thousand dollars worth of more stock outstanding to be redeemed.

"I, therefore, find that the Real Estate and Loan Company is insolvent, as alleged in the complaint.

"The paramount issue involved in this case is the regularity or irregularity of the transaction between the officers of the Real Estate and Loan Company and the National Union Bank and Haines & Bishop, their attorneys.

"On the 6th day of December, 1899, R. Lee Kerr, the secretary and treasurer of the loan company, having made the contract a short time previous with the officers of the bank, exhibited to these officials the resolutions embraced in exhibit 'BD,' which, on its face, was a certified copy of resolutions passed by the board of directors of the Real Estate and Loan Company, authorizing the president and secretary of the company to borrow from the National Union Bank a sum of money not to exceed $20,000, and to execute and deliver to the bank, in the corporate name of the company, a bond in the penal sum of $40,000, and to secure said bond, the president and treasurer of the company were authorized and directed to transfer and assign to the National Union Bank *'Any and all such notes, bonds, mortgages and stocks, choses in action and claims of any kind now belonging to or which may hereafter be acquired by the Real Estate and Loan Company'* (italics mine). And at the same time the said two officers were authorized and directed to buy the two judgments and note mentioned and described in said resolution, for a sum not exceeding $10,000; and in said resolution these officers were given power to consent that W. L. Roddey should be released from liability on the said note they were buying for their company. On the said 6th day of December, 1899, D. Hutchison and R. Lee Kerr, the president and secretary of the Real Estate and Loan Company, did execute and deliver to the bank the bond contemplated in the above resolution, and at the same time executed and delivered the paper marked exhibit

'ED'—a long list of judgments, notes, bonds, mortgages and stock—to secure said bond. So far as the evidence shows, everything *in sight* at that time belonged to the Real Estate and Loan Company. The National Union Bank at same time executed the paper marked exhibit 'FD,' assigning and transferring the two judgments and note above mentioned to the loan company, and at the same time the two said officers of the loan company executed on same sheet of paper·the assignment marked exhibit 'DD,' reassigning the said judgments and note to the bank to secure the $40,000 bond. The bank at same time gave the Real Estate and Loan Company a credit of $10,000 in cash—$7,999.27 of which was forwarded by the said National Union Bank to the National Atlantic Bank of Wilmington, N. C., to pay a note executed by the Real Estate and Loan Company and to release the loan company's $20,000 mortgage on Hutchison, which the loan company had given the Wilmington bank as security. The balance of the $10,000, about $2,000, was then turned over to R. Lee Kerr, and he says he put it in his *moribund* bank.

"In that transaction Capt. W. L. Roddey was released from liability on the $2,500 note, and while Mr. J. W. Roddey says in his testimony that the release was not a condition, *so far as the bank was concerned,* still he says it was embraced in the agreement, and R. Lee Kerr says in his testimony it was one of the conditions of the agreement reached that night in the bank. The testimony also shows that the Haines & Bishop contract was made about the same time, but was not formally executed until March 2d, 1900. The Haines & Bishop resolution and bond, exhibits 'ID' and 'JD,' respectively, are of the same kind and character as the bank resolutions and bond of December 6th, 1899. In this last transaction the Real Estate and Loan Company bought a certain judgment in favor of Haines & Bishop, based on a note of A. E. and D. Hutchison, and also a note held by the Farmers' and Merchants' National Bank of Baltimore, on A. E. Hutchison, and the two said officers of the Real Estate

and Loan Company were authorized to execute a bond and
pledge *'any and all such judgments, notes, bonds, mort-
gages, choses in actions or securities of any kind now belong-
ing to or hereafter to be acquired by the Real Estate and
Loan Company'* (italics mine).   Accordingly, D. Hutchi-
son, president of the loan company, and R. Lee Kerr, its
secretary and treasurer, did, on the 2d day of March, 1900,
execute and deliver the bond marked exhibit 'JD' and the
assignment marked exhibit 'KD.'   R. Lee Kerr, on the back
of this bond, under his hand and seal, *personally* guarantees
the payment thereof, and, in exhibit 'KD,' the *judgments*
and *notes purchased* by the loan company are *reassigned*
and the securities assigned to the National Union Bank, and
some additional securities, that had presumably come *in sight*
since December 6th, 1899, are included.

"The last report of the treasurer, recorded in the minute
book before me, made at the annual meeting of the stock-
holders of the company held on March 23d, 1897, shows
assets to the amount of $89,995.50—$80,250.01 of which
was represented by loans, and the company at that time was
in a healthy financial condition.   At the meeting of the
directors held on same day, a finance committee of three of
the directors was appointed, and this finance committee were
directed to make quarterly examinations of the books and
assets of the company.   It seems from this minute book,
exhibit 'C,' that at this meeting mentioned in March, 1897,
the defendant, R. Lee Kerr, was elected secretary and
treasurer, and the books and assets of the company were
turned over to him by his predecessor in office, Mr. J. M.
Cherry.   The only minute recorded in the book, exhibit 'C,'
by the defendant, R. Lee Kerr, is a minute of the directors,
held on the 30th day of December, 1897, at which meeting
a loan of $240 was considered and approved.   After that all
is a blank.   No minute book nor any recorded proceedings
of the stockholders or directors of the company have been
produced before me.   The defendant, R. Lee Kerr, swears
positively that he procured a new minute book and recorded

the minutes therein, and that he placed this book in the vaults of the Commercial and Farmers' Bank, and that the bank went into the hands of a receiver, and the book cannot be found by him.    The receiver of the bank, D. Hutchison, also the president of the Real Estate and Loan Company, swears positively that he never saw or heard of any minute book, other than the one offered in evidence, exhibit 'C.' And he further swears that no other minute book was ever kept, so far as he knew.    It seems that some time prior to the first day of December, 1899, and up to the present time, the Real Estate and Loan Company had only five directors, to wit: R. Lee Kerr, A. H. White, W. C. Hutchison, D. Hutchison and Frel Mobley.    D. Hutchison was the president of the company and R. Lee Kerr was its secretary and treasurer during that time.

"And first, it is contended by the plaintiff that the directors of the Real Estate and Loan Company never saw, acted upon or heard of the resolutions of December 5th, 1899, and March 2d, 1900, exhibits 'BD' and 'ID,' respectively.    Unfortunately, the testimony on this point is contradictory and unreconcilable.    The defendant, R. Lee Kerr, who presented the resolutions to the bank and to the attorneys for Haines & Bishop, swears positively that the directors held the two several meetings mentioned in said resolutions, and even goes into the details of the March meeting.    On the other hand, D. Hutchison, the president of the company, says 'he knew of no meeting in December, 1899, and that he did not attend any at that time.'    This witness also says, 'that a meeting was called in March, 1900, but the members did not appear and no meeting was held; and witness made the call for this meeting, but no one attended it except the secretary and this witness.    W. C. Hutchison, another director of the company, upon being asked whether or not he attended the meeting of the directors in November or December, 1899, at which meeting resolution exhibit 'BD' was passed, states positively and point blank, 'I did not—I did not know anything of it.'    And the same witness, upon being asked

whether or not he attended the meeting of the directors in March, 1900, at which resolution exhibit 'ID' is claimed to have been passed, replied, 'No, sir, I did not; no such meeting was ever held to witness' knowledge, and if such meeting was held, witness knew nothing of it and was not present.' A. H. White, another director, upon being asked whether or not a meeting was held and passed the resolution exhibit 'BD,' answered, 'No, sir; and no such meeting was ever held to my knowledge;' and the same witness, upon being asked whether or not he attended the meeting in March, at which the Haines & Bishop resolution is purported to have been passed, answered, 'No, sir; and no such meeting of the board was ever held to consider such matters, as I know of.' The only other director of the company was Frel Mobley, and he was out of the State, and it seems that from the testimony, never acted as a director of the company. Thus we have the positive testimony of the directors directly against the equally positive testimony of R. Lee Kerr, the other director and secretary and treasurer of the company.

"Counsel for defendant objected to these questions and answers on the ground that the minute of such meeting was the highest and best evidence, and that the witnesses being parties to the action and officers of the company, were estopped from so testifying. But it must be remembered that R. Lee Kerr was the secretary and treasurer of the company, in charge of its seal, its books and its assets, and it seems from the testimony that no one ever saw the new minute book except R. Lee Kerr, and it does seem to me that if he had had such minute book, certainly at some of the numerous meetings he testifies to have held, this new minute book would have been needed and used as a matter of reference.

"Again, from the testimony of D. Hutchison, it seems he found the old minute book in the office of the Crescent Cotton Mills, which was the old Rock Hill Cotton Factory Company, reorganized under that name, and from the records offered in evidence R. Lee Kerr was the receiver

of the Cotton Factory Company and the secretary and treasurer of the Crescent Cotton Mills, and evidently in charge of the old minute book when found, and of the new one also, if there was one.

"From the testimony and all the circumstances connected with the matter, I think it is extremely doubtful about any minutes being kept of the proceedings after R. Lee Kerr took charge of the company's assets. There may have been a meeting of the stockholders in 1898, as D. Hutchison in his testimony says there was a meeting of the directors then, and no other meeting of the directors until one in the summer of 1900, referred to in the testimony of B. P. Reid, and R. Lee Kerr on the last page of his testimony testified as follows: 'Q. Mr. Kerr, in making loans for the Real Estate and Loan Company, did you call on the finance committee, as the by-laws required? A. No, sir. Q. Nor on the board? A. No, sir. Q. Nor in borrowing money did you consult with either? A. Only in these three cases.' Consequently there would be very little record in this new minute book. The last minute recorded in the old book was December 30th, 1897. By reference to this book it will be noted that the proceedings each year when the company was in a flourishing condition, only covered about four or five pages a year; and according to Mr. Kerr's testimony, he begun recording proceedings in the new minute book in 1898, and we find that he certifies that the resolution of December 5th was recorded on pages 20 and 21 of the minute book, so the last minute book must have been a very small book, or the secretary did not begin recording his minutes on the first page thereof. But again, in the Haines & Bishop resolution of March 2d, 1900, exhibit 'ID,' R. Lee Kerr certifies that the resolution was recorded on pages 43 and 44 of the minute book—thus in less than three months the proceedings of the company have covered over twenty pages, and no meetings in the meantime.

"I find from the testimony that no meeting of the directors of the Rock Hill Real Estate and Loan Company was

held as set out in exhibits 'BD' and 'ID,' and that the resolution purported to have been passed on those two occasions was the work of R. Lee Kerr, and no such resolutions were passed by the board of directors of said company.

"It is contended by the defendants, that under the power incident to corporate existence and the powers implied from those expressly conferred, under the charter of The Rock Hill Real Estate and Loan Company, the said company had the power and legal right to enter into this contract with the National Union Bank and Haines & Bishop. And it is also contended that the charter of a corporation is construed strictly in favor of the public. There is no doubt that under the law The Rock Hill Real Estate and Loan Company had the right to borrow money for corporate purposes and to pledge its assets for that purpose. 'It is a well settled principle of corporation law, that a corporation, except in so far as it may be restricted by its charter, has the same power as an individual to enter into any contract that may be necessary or usual in the course of the business for which it was created, or that is reasonably incident thereto. This power is always implied in the absence of positive restriction in its charter.' Amer. and Eng. Ency. Law, 7, 755. I think there is no doubt under the law this corporation had the right to compromise suits by or against it. A corporation has the same right as a natural person along this line. In other words, in my judgment, under the law the corporation itself, with the consent of *all* of its stockholders and owing no debts, could have made the contracts with the bank and Haines & Bishop had it seen *proper* to do so; but the question before me is not whether the *corporation* had the *right* to make these contracts, but whether the *directors* of the corporation had the *power* to make *such contracts*. And the question at issue is a still narrower channel, whether or not R. Lee Kerr, the secretary and treasurer of the corporation, had the power to make such contracts. It is contended that inasmuch as the directors suffered R. Lee Kerr to have the actual charge and management of the

general business of the Real Estate and Loan Company, that
the directors by tacitly acquiescing in his control and
management of the same, had really made him their agent,
and that R. Lee Kerr's act was the act of the directors.    I
think it is a plain inference from the testimony that the
directors permitted R. Lee Kerr to have absolute control
over the assets of the defendant corporation, and that he
managed these assets as it suited his convenience and for
whatever purpose he wished; from his own testimony, in
borrowing money he called on the directors only on three
occasions.    But in the case at issue, Kerr was specially
instructed by the officers of the bank and by the attorneys for
Haines & Bishop, to call his directors together and pass the
resolutions, exhibits 'BD' and 'ID.'    'An assignment by the
secretary, not executed by the corporation, is not a corporate
act unless the secretary is not only authorized to make the
assignment, but also to make it in his official capacity.    The
secretary is not vested with such authority by virtue of his
office.'    Amer. and Eng. Ency. Law, 7, 134.    And even if
Kerr was held out to the world as the agent of the Real
Estate and Loan Company, the corporation could only be
bound by such acts and contracts of his that were done and
made within the scope of his authority.    'He who deals with
a corporation is chargeable with notice of the purpose for
which it was formed, and when he deals with its agents or
officers, he is bound to know their power and the extent of
their authority.    This rule applies to foreign corporations
as well as to domestic corporations chartered by private acts
of the legislature, as well as to those whose charters are
part of the general laws.'    'Persons dealing with the cashier
of an incorporated savings bank, as such, are chargeable
with knowledge of the corporate powers of the bank and of
the extent to which the cashier can bind it; and it is imma-
terial that the institution is a foreign one.'    L. R. A., 9,
708.    'As a general rule, based on grounds of public policy,
an agent cannot act so as to bind his principal, where he has

or represents interests adverse to those of his principal.' Amer. and Eng. Ency. Law (New), 1, 1178f.

"But in addition to this, R. Lee Kerr was a director and officer of the Real Estate and Loan Company. 'The director of a corporation, entrusted by others with powers which are to be exercised for the common and general interests of the corporation, and not for his private interests, occupies the relation of trustee to such corporation and its property. He falls, therefore, within the great rule by which equity requires that confidence shall not be abused by the party in whom it is reposed, and which it enforces by imposing a disability, either partial or complete, upon the party entrusted to deal on his own behalf in respect of any matter involving such confidence. So all advantages, all purchases, all sales, and all sums of money received by directors dealing with the property of the corporation, are made and received by them as trustees of the corporation, and they must account for all such moneys or advantages received by them by reason of their position as trustees. There is an inherent obligation implied in the acceptance of such trust, not only that they will use their best efforts to promote the interest of the shareholders, but that they will in no manner use their positions to advance their individual interest as distinguished from that of the corporation, or acquire interests that may conflict with the fair and proper discharge of their duty. So the directors have no authority to bind the company to any contract made with themselves personally, or to represent it in any way with third parties in which they have a private interest at stake; nor have they any right to use either the assets or credits of the corporation, or any of the powers of their office except to advance the interest of the company, irrespective of their own advantage or desires. So where the property of the corporation has thus been fraudulently or wrongfully disposed of by the directors, the creditors and stockholders may pursue it into the hands of purchasers with notice, and assert their lien upon it or their claims for its value.' Amer. and Eng. Ency. Law, 17, 91,

95.  'In *Twin Lick Oil Co.* v. *Marbury,* 91 U. S., 587, 588, Mr. Justice Miller, delivering the opinion of the Court, said: "That a director of a joint stock corporation occupies one of the fiduciary relations where his dealings with the subject matter of his trust or agency, and with the beneficiary or party whose interest is confided to his case, is viewed with jealousy by the Courts, and may be set aside on slight grounds, is a doctrine founded on the soundest morality and which has received the clearest recognition in this Court and in others.  The directors of a corporation being its agents or trustees for the purpose of carrying on its business and promoting the ends designed by its charter, they obviously have no power, without a strict authorization from their stockholders, to determine its business and defeat the object of its charter, by selling out, *en masse,* its corporate assets and good will, unless the charter, by express terms or necessary implication, confers this power upon them.  In the view of one Court, they cannot, unless specially empowered, make sale of any portion of its estate, essentially necessary for the transaction of its customary business." '   3 Thomp. Corp., sec. 3982.   'If the thing done by the directors is not only *ultra vires* but prohibited by positive law, no one participating in it with knowledge can acquire any right in respect of it.'  *Idem.,* sec. 3999.   Again, as a matter of law, directors are bound to exercise their powers for the benefit of all the stockholders with the utmost good faith. And yet again the law is quoted in the same authority, in sec. 4022, on the point that directors are not allowed to make a profit out of their trusts, as follows: 'When agents and others acting in fiduciary capacity, understand that these rules will be rigidly enforced, even without proof of actual fraud, the honest will keep clear of all dealings falling within their prohibition, and those dishonestly inclined will conclude that it is useless to exercise their wits in contrivances to evade it.'   This is an application of the general principle that an agent cannot speculate out of his agency and that a trustee cannot speculate out of his trust, and that what he

gains by such speculation, in the case of an agent, belong to his principal, and in the case of a trustee, to the trust fund. The principle has a twofold operation: If the contract is executed, and the director or other fiduciary has received the benefit, the law appropriates the benefit to the corporation or other *cestui que trust;* but if the agreement remains executory, the law avoids it altogether. 'The law avoids contracts and promises made with a view to place one under wrong influences—those which offer him a temptation to do that which may affect injuriously the rights and interest of third persons.' Or, as again stated: 'It is a sufficient objection to a contract, on the ground of public policy, that it has a direct tendency to induce fraud and malpractice upon the rights of others, or the violation or neglect of high public duties. The directors of a corporation are trustees for its stockholders. When the corporation becomes insolvent, the directors become trustees for the corporation creditors.' *Olney* v. *Conanicut Land Co.,* 5 L. R. A., 361. On the question of fiduciary relation, see First Morawitz, sec. 516, where it is held, 'that the entire corporate affairs are placed in charge of the directors upon the trust and confidence that they shall be cared for and managed for the common benefit of the stockholder and in accordance with the provisions of the chartered agreement, and when it is also held that the directors occupy a position of the highest trust and confidence, and the utmost good faith is required of them.' It is also plain under the law that no board of directors or the agent of any corporation has any power to give away the assets· of the corporation gratuitously, nor can they create a corporate obligation gratuitously. And I think it is equally plain under the law that the corporation has no legal right to use the corporate assets to compromise litigation which is not for the company's benefit. The law is equally positive that the directors have no right under any circumstances to use their official position for their own benefit or the benefit of any one except the corporation. 'It is for this reason that the directors have no authority to represent the corporation in any

transaction in which they are personally interested in obtaining an advantage at the expense of the company. The corporation would not have the benefit of their disinterested judgment under these circumstances, as self-interest would prompt them to prefer their own advantage to that of the company. Accordingly, it has been held, in numerous cases, that the directors of a corporation have no authority to bind the company to any contract made with themselves personally, or to represent it in any transaction with third persons, in which they have a private interest at stake.' First Morawitz, sec. 517. There can be no doubt that the corporation has an absolute right to repudiate the unauthorized acts of its directors or agents. 'The power of an agent to bind the principal by contract, or to dispose of his property, depends entirely upon the measure of authority delegated by the principal. If an agent enters into an unauthorized contract, or makes an unauthorized disposition of property belonging to the principal, the latter is not bound by the transaction either at law or in equity, unless he is estopped from denying the authority of the agent to bind him.' First Morawitz, sec. 523. On the same line, in Clark on Corporations, page 512, we find the following: 'In these jurisdictions the law does not inquire whether the transaction was fair or unfair, but stops the inquiry as soon as the relation is disclosed, and sets aside the transaction, or refuses to enforce it, at the instance of the corporation, without asking whether there was fraud or not. As was said in a New York case, it prevents frauds by making them, as far as may be, impossible, knowing that real motives often elude the most searching inquiry; and it leaves neither to judge or jury the right to determine upon a consideration of its advantages or disadvantages, whether a contract made under such circumstances shall stand at all. It makes no difference in their jurisdictions that only one director is a party to the contract, and that there were a number of other directors who have voted for the contract, and who were not personally interested.' In *Claflin et al.* v. *The Farmers' and Citizens' Bank,* 25 New York, 293, it is

5—65

held that where the face of a check shows that the president of the bank was attempting to use his official character for his private benefit, every one to whom the check came was put upon inquiry.

"The National Union Bank went into its vaults and took out $10,000 in cash upon R. Lee Kerr presenting the bank with a bond signed by himself and the president of the loan company in their official capacity, and a certified copy of a resolution that on its face appeared regular and apparently passed by the entire board of directors. Now, if the National Union Bank is a *bona fide* holder of this bond and of these securities, the bank has a right to presume that the papers were issued under the circumstances which gave the requisite authority, and these papers cannot be impeached for any infirmity in the hands of a *bona fide* holder any more than any other commercial paper can. If the Real Estate and Loan Company had the right to issue negotiable securities, such securities possess the legal character ordinarily attached to legal paper, and the holder in good faith before maturity and for value and without notice, I think under the authorities may recover, even though these negotiable securities were irregularly issued by the corporation. And while trust funds of property that has passed into the hands of a *bona fide* purchaser for value, cannot be followed by the *cestui que trust*, yet, trust funds may be followed into the hands of a purchaser who acquired them with notice, either actual or constructive, of the trust, whether he derives his title directly from the fiduciary or from a *bona fide* purchaser without notice. Is the National Union Bank an innocent party to this contract? W. J. Roddey, president of the bank, at page 17 of his testimony, says, 'that he knew that at the time that the creditors of the Rock Hill Cotton Factory Company required a bond to be executed to secure the deposits of the receiver, that R. Lee Kerr kept his deposits in the Commercial and Farmers' Bank.' That same witness also states 'that he knew that a large part of the A. E. Hutchison estate was debts against the Rock Hill Cotton Factory Company, and

that these debts were to be paid out of the receiver's funds.' A copy of the bond given to secure the receiver's fund is set out in the petition of Haines & Bishop, exhibit 'B,' and a reference to same shows that it is dated the 1st day of December, 1899. The transaction with the bank occurred on the 6th day of December, 1899. The same witness also states that 'W. B. Wilson, the attorney for the bank, had general instructions, but he did not know what steps he had taken to collect the bank papers.' Witness also states 'that he was not pleased with the management of the Real Estate and Loan Company because it seemed careless and unbusinesslike.' And the same witness also states in his testimony, 'that at the time Kerr made application to his bank for this $20,000 loan, the National Union Bank had commenced proceedings by examination before the referee in bankruptcy, to set aside the mortgage of $20,000 given by A. E. Hutchison to The Rock Hill Real Estate and Loan Company; also, a deed for $25,000 worth of property given by A. E. Hutchison to A. H. White, and also a deed for about $8,000 worth of property given by A. E. Hutchison to W. C. Hutchison.' Thus the bank at that time was attacking the validity of a deed in which A. H. White, one director, was interested to the amount of $25,000; attacking the legality of another transaction in which W. C. Hutchison, another director, was personally interested to the amount of $8,000, and the bank was also interested in two large judgments against D. Hutchison, another director, and president of the company, and the bank was also interested in the funds in the hands of R. Lee Kerr, receiver, and knew at the time of the transaction that he was mistrusted and had to give bond to secure his deposits.

"It is contended by the defendants that this transaction with the bank settled litigation involving the Hutchison mortgage of $20,000. But it seems from the proceedings in the case of *ex parte* Thos. F. McDow, trustee of A. E. Hutchison, bankrupt, *in re* The Estate of said Bankrupt, that the receiver of the Commercial and Farmers' Bank claims this

$20,000 mortgage had been pledged to the Commercial and Farmers' Bank as security for a large debt on which there was still due at least $14,500; and the receiver of this bank claims that it was pledged to secure this debt before R. Lee Kerr sent it to the National Atlantic Bank of Wilmington, N. C. So it would seem from the testimony before me that there was little or nothing in the $20,000 mortgage for the Real Estate and Loan Company at the time of the transaction with the National Union Bank; so it seems to me that the loan company had nothing to gain by compromising any threatened litigation about the $20,000 mortgage. Then again, the cotton factory claims that were sold by the National Union Bank and Haines & Bishop and the Baltimore Bank to the Real Estate and Loan Company were comparatively worthless. The receiver of the Cotton Factory Company has paid a dividend of less than three per cent. on these claims, and the estate of A. E. Hutchison has paid a dividend of only four per cent., and, as shown by the evidence and records offered in evidence, if another cent is ever paid out of either estate, it will be only after long and expensive litigation. It does seem to me, under all the facts and circumstances developed in this case, that these transactions of the officers of the Real Estate and Loan Company with the National Union Bank and with Haines & Bishop, were neither just nor right nor lawful. The bank and Haines & Bishop were not attempting to collect any debts out of the Real Estate and Loan Company—that Real Estate and Loan Company did not owe them one cent. But both the bank and Haines & Bishop were *attempting to collect debts* out of A. E. Hutchison, the father of D. Hutchison, the president of the loan company, and out of D. Hutchison himself; and to accomplish their purposes they were threatening to bring suits against A. E. Hutchison and D. Hutchison, W. C. Hutchison and A. H. White, the last three being directors of the loan company. And the officers of the Real Estate and Loan Company used the assets of their company to pay their individual indebtedness and to compromise suits against

themselves as individuals, and, when the justly outraged
stockholders demanded their money, they were referred to
the empty shell—the clean swept and empty treasury—and
bluntly told that there were no unpledged assets, and practi-
cally advised to wait until this individual indebtedness was
paid, and then thank their Maker if a little balance was left
for them.

"In the Haines & Bishop transaction of March 2d, 1901,
there is no doubt, as shown by exhibit 'B,' that Haines &
Bishop had commenced an action to remove R. Lee Kerr as
receiver of the Rock Hill Cotton Factory Company, and the
conclusion is irresistible that R. Lee Kerr made this deal, not
in the interest of the Real Estate and Loan Company, but
from personal considerations and to hold his position as re-
ceiver of said factory.    Then, too, the judgment and claims
that he purchased were claims and judgments for which D.
Hutchison, the president and director of the loan company,
was personally liable, and the Baltimore bank's claim against
D. Hutchison's father.    Consequently, in my judgment, this
transaction was illegal and utterly null and void, and I so
find.    In the transaction with the National Union Bank, the
bank officials live in the same town that the loan company is
located in, and the National Union Bank, as shown by exhibit
'GD,' had had large monetary transactions with the Real
Estate and Loan Company, and, as shown by said exhibit,
the National Union Bank was not fully satisfied with the
assignment of securities by the president and secretary and
treasurer of said company; and it is evident also from the
testimony of W. J. Roddey and R. Lee Kerr, that at this par-
ticular juncture, about the first of December, 1899, the bank,
being dependent upon the funds in R. Lee Kerr's hands, as
receiver, for the amount they would realize on the Hutchison
judgments, and the bank also knowing that two checks of the
Commercial and Farmers' Bank had been protested, had
reached the conclusion that their chances were growing less
and less every day to realize on these Hutchison judgments;
and there is no doubt from Kerr's testimony that he was

being pressed for a settlement. Now, it was under these circumstances that the transaction between Kerr and the National Union Bank occurred. Kerr was hard pressed for money to keep the doors of his sinking bank open, and while it is possible he borrowed $7,000 from the Atlantic National Bank of Wilmington, N. C., not for the Real Estate and Loan Company, as he says, but for the Commercial and Farmers' Bank, his dying bank, and there is enough in the evidence before me to warrant such investigation, and while, also, it is a significant fact that the note Kerr gave to the Wilmington bank for this money has been lost or mislaid, still there is nothing in the evidence going to show that the National Union Bank of Rock Hill, S. C., had any knowledge whatever of any irregularity in this transaction between the Real Estate and Loan Company and the Atlantic National Bank of Wilmington, N. C.

"I, therefore, think that, under the law, the National Union Bank having paid off the claims the Wilmington bank held against the loan company, out of the funds obtained by virtue of this transaction, would stand in the shoes of the Wilmington bank, and can recover from the Real Etate and Loan Company the cash it advanced for this purpose; and I so hold.

"Can the bank recover from the loan company the $1,996.73 given to Kerr in cash on this account? As I view the facts and the law applicable to these facts, there is considerable doubt on this question. Taking into consideration all the facts and circumstances surrounding Kerr at that time, it is very probable that this money was used in his dying bank. There is no pretense that the Real Estate and Loan Company needed money at this time other than the amount to pay off the Wilmington bank claim, and I do not believe from the facts before me that this $2,000 was borrowed for the Real Estate and Loan Company. But while all this is true, I cannot find from the evidence any testimony showing that the officials of the National Union Bank know why Kerr demanded this $2,000 in cash. They may have

known in a general way that this once proud financial swimmer was struggling for life, and that there was danger of his sinking and carrying several institutions down with him. But it must be remembered that the National Union Bank had the evidence before it in the Wilmington bank claim that the Real Estate and Loan Company did owe money, and if it owed money in Wilmington, it might owe money elsewhere. It is also in evidence that the president and secretary of the loan company had borrowed money before this time from the National Union Bank. Under the law as laid down in 5 Thompson on Corporations, sec. 5984, and under all the facts and circumstances developed before me, I believe the bank is entitled to recover this sum also from the loan company; and I so find.

"But since the National Union Bank and Haines & Bishop and the Baltimore bank and their attorneys, as a matter of law, are presumed to know that directors of the loan company could not use their corporation assets to purchase claims in which they were personally interested and pledged practically every asset the loan company had, in doing so, and especially when the facts and circumstances show that the contracts were practically made under compulsion, under the evidence before me, viewed in the light of the authorities hereinbefore cited, I must hold that the transaction whereby the bank and Haines & Bishop and the Baltimore bank and their attorneys, sought to sell their cotton factory claims to the Real Estate and Loan Company are illegal, null and void; and I so find.

"I, therefore, find that the receiver of The Rock Hill Real Estate and Loan Company is entitled to recover the assets of his corporation from the National Union Bank of Rock Hill, S. C., and that the said bank, after being repaid for the money advanced to Kerr, should account for all the assets of the Real Estate and Loan Company in its hands and for all money received on said assets.

"And I also find that Haines & Bishop and the Baltimore bank and their attorneys should account for all the assets of

the Real Estate and Loan Company and all moneys received by virtue of the transaction herein mentioned.

"All of which is respectfully submitted."

From Circuit decree confirming this report, the defendants, the National Union Bank of Rock Hill, S. C., Haines & Bishop, and W. B. Wilson, as attorney and agent, appeal on the following grounds, to wit:

"1. For error in overruling all of defendants' exceptions to the report of J. S. Brice, referee, in said cause.

"2. For error in finding that The Rock Hill Real Estate and Loan Company is insolvent.

"3. For error in finding that the resolutions set out in exhibits 'BD' and 'ID' were not passed by the board of directors of The Rock Hill Real Estate and Loan Company.

"4. For error in finding that the $20,000 Hutchison mortgage was pledged to the Commercial and Farmers' Bank for a debt upon which there was still due at least $14,500 before it was sent to the National Atlantic Bank of Wilmington, N. C., and that there was little or nothing in said mortgage for The Rock Hill Real Estate and Loan Company at the time of the transaction with the National Union Bank of Rock Hill, S. C., and that said company had nothing to gain by compromising any threatened litigation about said mortgage; and in failing to find that it was to the best interests of said company that such threatened litigation be compromised.

"5. For error in finding that the cotton factory claim sold by the National Union Bank and Haines & Bishop and the Baltimore bank to The Rock Hill Real Estate and Loan Company were comparatively worthless.

"6. For error in finding that the transactions with The National Union Bank and Haines & Bishop were unjust, illegal and void.

"7. For error in finding that R. Lee Kerr made said transactions, not in the interests of The Rock Hill Estate and Loan Company, but from personal consideration, and that said contracts were practically made under compulsion.

"8. For error in finding that the receiver of The Rock Hill Real Estate and Loan Company is entitled to recover from the National Union Bank the assets of said corporation, and that said bank, after being paid for the money advanced to the Wilmington bank and the cash advanced to Kerr, should account for all the assets of The Rock Hill Real Estate and Loan Company in its hands and for all money received on said assets.

"9. For error in finding that Haines & Bishop and the Baltimore bank and their attorneys should account for all assets of The Rock Hill Real Estate and Loan Company and all moneys received by virtue of the transactions therein mentined.

"10. For error in failing to find that the National Union Bank and Haines & Bishop are wholly innocent of any irregularities or defects of any kind in the transactions with The Rock Hill Real Estate and Loan Company, through its president and secretary, and that they are *bona fide* holders of the bonds and collaterals securing the same, as set out in their answer, and that they are entitled to be paid the same in full."

*Messrs. Wilson & Wilson,* for appellants, cite: *Officer acting within scope of his authority although committing a fraud binds his corporation:* Clark Corp., 525, 137 N. Y., 231; 2 Cumming Cas. Priv. Corp., 149, 483, 499, 494; 34 N. H., 378; 17 Ency., 130, note, 135, 136, 137, 138; 10 Wall., 604; 110 U. S., 7; 2 Wall., 122. *Business of a corporation may be entrusted to an officer by resolution or acquiescence:* 37 L. R. A., 682; 62 Ill., 493; Mor. Priv. Corp., 538. *As to bona fides and notice:* 4 Ency., 300, 303; 20 How., 343; 2 Wall., 110; 21 Wall., 354; 96 U. S., 57; 102 U. S., 14, 442; 8 S. C., 290; 14 S. C., 145; 12 S. C., 272.

*Mr. Jas. F. Hart,* contra, cites: *As to distinction between mortgage and pledge:* Jones on Chattel Mtg., 4, 12; 1 Ency., 893.

December 13, 1902.    The opinion of the Court was delivered by

MR. JUSTICE GARY.    The facts of this case are fully set out in the report of the special referee, which was confirmed by a formal order of the Circuit Court.    It will be incorporated in the report of the case.    In order to understand clearly the question at issue, it will be necessary to refer to the pleadings which are stated in said report.    This action was brought, not by creditors, but by a stockholder on behalf of herself and other stockholders, to have the transfers made in pursuance of the resolutions mentioned in the complaint, declared null and void.    The defendants appealed upon exceptions, which will be set out in the report of the case, but it will not be necessary to consider them in detail, as the practical questions presented by them are:

1. Did the board of directors of The Rock Hill Real Estate and Loan Company have the power to enter into the agreements mentioned in the resolution purporting to have been adopted by said board?

2. Was the action of R. Lee Kerr, secretary and treasurer of said corporation, binding upon it, even admitting that the resolutions were not authorized by the board of directors?

3. Was the action of the board of directors in acquiescing in the conduct of R. Lee Kerr, secretary and treasurer, a fraud upon the rights of the other stockholders?

4. Were the defendants *bona fide* holders of the property transferred to them in pursuance of the said resolutions?

We will first consider whether the board of directors of The Rock Hill Real Estate and Loan Company had the power to enter into the said agreements.    The Rock Hill Real Estate and Loan Company was chartered by a special act of the legislature in 1888—20 Stat., 248—by which, as stated by the special referee, it was authorized and empowered to loan and borrow money for the benefit of its members and stockholders, and to sell, alien, convey, or mortgage or otherwise dispose of its property, as it might deem expedient, subject to such regulations as might

be prescribed by the rules and by-laws of said corporation. The special referee states that under the by-laws of said corporation it is provided that "the business of this corporation shall be under the care, management and control of a board of directors." Under the foregoing provisions of the act and the by-laws of the corporation, the board of directors unquestionably had the power to enter into said agreements.

We will next consider whether the action of R. Lee Kerr, secretary and treasurer, was binding upon the corporation, even admitting that the resolutions were not authorized by the board of directors. At the foot of the resolution marked "B," is the following certificate: "I, R. Lee Kerr, secretary of The Rock Hill Real Estate and Loan Company, do hereby certify that the above is a true copy of the resolution adopted by the board of directors of The Rock Hill Real Estate and Loan Company, at a meeting held on date above written, and that the same has been duly enrolled in the minute books of the said company on pages 20 and 21. Rock Hill, S. C., Dec. 5th, 1899. R. Lee Kerr, secretary." The certificaate at the bottom of the other resolution is substantially the same as the foregoing. In his report the special referee says: "I think it is a plain inference from the testimony, that the directors permitted R. Lee Kerr to have absolute control over the assets of the defendant corporation, and that he managed these assets as it suited his convenience and for whatever purpose he wished; for from his own testimony in borrowing money he called on the directors only on three occasions." Furthermore, the board of directors acquiesced in the action of R. Lee Kerr, as shown by the allegations of the complaint. The signing of the certificates was within the scope of his employment, and, therefore, even if they were unauthorized and fraudulent on the part of R. Lee Kerr, his action was nevertheless binding upon the corporation. *Reynolds* v. *Witte,* 13 S. C., 5. In the case just mentioned, the Court quotes with approval the following language from sec. 452 of Story on Agency: "It is a general doctrine of law, that although the principal is not ordinarily

liable (for he sometimes is) in a criminal suit for the acts or misdeeds of his agent, unless, indeed, he has authorized or co-operated in them, yet he is held liable to third persons in a civil suit for the frauds, deceits, concealments, misrepresentations, negligences and other malfeasances and omissions of duty of his agent *in the course of his employment,* although the principal did not authorize or justify or participate in, or, indeed, know of such misconduct, or even if he forbade the acts or disapproved of them.    In all such cases the rule applies *respondeat superior;* and it is founded upon public policy and covenience, for in no other way could there be any safety to third persons in their dealings, either directly with the principal, or indirectly with him through the instrumentality of agents.    In every such case the principal holds out his agent as competent and fit to be trusted, and thereby, in effect, he warrants his fidelity and good conduct in all matters within the scope of the agency."    In stating the reason for this rule, Lord C. J. Holt says: "Seeing that some one must be loser by the deceit, it is more reasonable that he who employs and confides in the deceiver should be the loser than a stranger."    This principle is also fully supported by numerous authorities cited in the argument of appellant's attorneys.    We are, therefore, of the opinion that the conduct of R. Lee Kerr, secretary and treasurer, was not only binding on the corporation by reason of its ratification by the board of directors, but likewise because the signing of the certificates was within the scope of his employment.

We will next consider whether the action of the board of directors in acquiescing in the conduct of R. Lee Kerr, secretary and treasurer, was a fraud upon the rights of the other stockholders.    It cannot for a moment be contended that the ratification by the board of directors of R. Lee Kerr's conduct and the refusal by said board to institute legal proceedings to set aside said transfers, constituted fraud upon the rights of other stockholders, unless the board had notice of such facts as might reasonably be ex-

pected to furnish the basis for a successful attack upon said transfers.

We have shown that the fact that the action of R. Lee Kerr was unauthorized, did not prevent it from binding the corporation, as it was within the scope of his employment. The only other ground under the pleadings upon which the board could have instituted proceedings to set aside the transfers, was that the defendants were not *bona fide* holders of the property assigned in pursuance of the resolutions, and this brings us to the question whether they were *bona fide* holders of such property, which we will next consider. It might well be contended, under the doctrine announced in *Levister* v. *Ry. Co.,* 56 S. C., 508, 35 S. E. R., 207; *Riggs* v. *Association,* 61 S. C., 448, 39 S. E. R., 614; and *Thompson* v. *Insurance Co.,* 63 S. C., 290; that the stockholders are not in a position to raise the question of fraud, as they have not offered to return the benefits which they derived from the transactions hereinbefore mentioned. This Court, however, does not find it necessary to apply that doctrine in this case. The law is well settled in this State, that even if there was fraud upon the part of R. Lee Kerr, it did not affect the rights of the defendants unless they had notice of such fraud—*McElwee* v. *Kennedy,* 56 S. C., 170, 34 S. E. R., 86. Although the testimony shows that the directors permitted R. Lee Kerr to have absolute control over the assets of the corporation, and that he managed these assets as suited his convenience and for whatever purpose he wished, nevertheless, out of caution, Kerr was specially instructed by the officers of the bank and by the attorney for Haines & Bishop to call a meeting of the directors for the purpose of passing said resolutions, thus showing good faith. The value of the choses in action sold by the defendants was determined and agreed upon after calculations on both sides. In so far as it contended that certain directors were personally benefited by said transactions, it must be remembered that the claims upon which they were liable were not *paid* with funds belonging to The Rock Hill Real Estate

and Loan Company, but that they were only assigned to it.
The liability of the directors was not thereby diminished,
but there was only a difference as to the holders of the claims.
Furthermore, it cannot be said that the directors fraudulently
entered into said transactions, for the complaint shows they
took place without their knowledge. The testimony fails to
sustain the allegations of the complaint that the defendants
are not *boda fide* holders.

The respondents gave notice that they would move the
Court on the additional ground "that the alleged resolutions
of the board of directors of The Rock Hill Real Estate Loan
Company, of December 5th, 1899, and of March 2d, 1900,
if they were adopted, and the alleged transfers of assets pur-
suant thereto, in effect, constitute chattel mortgages, which
said board was powerless to authorize without the consent of
the stockholders." For the reasons hereinbefore stated, this
ground cannot be sustained.

It is the judgment of this Court, that the judgment of the
Circuit Court be reversed.